**Paul F. WAERING and Daria A. Waering, his wife, Plaintiffs,**

v.

**BASF CORPORATION, and Golden Distribution Company, Defendants,**

v.

**Sterling Logistics Corporation d/b/a Sterling Quality Logistics and Quality Logistics Specialists, Additional Defendants.**

**No. 3:CV–99–0906.**

United States District Court, M.D. Pennsylvania.

May 23, 2001.

Edward F. Pietrowski, Scranton, PA, for Plaintiffs.

Howard M. Klein, William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, Philadelphia, PA, for BASF Corp., defendant.

Randall G. Gale, Thomas, Thomas & Hafer, Harrisburg, PA, for Golden Distribution Co., defendant.

James Andrew Doherty, Jr., James M. Howley, Scanlon, Howley, Scanlon & Doherty, Scranton, PA, for Sterling Quality Logistics, Defendant.

## MEMORANDUM

CAPUTO, District Judge.

This personal injury action arose from Plaintiff Paul Waering's inadvertent exposure to potassium metabisulfite and includes claims of negligence, strict products liability and loss of consortium. Presently before the court are the separate motions for summary judgment of Defendant BASF Corporation ("BASF"), Defendant Golden Distribution Company ("Golden") and Third–Party Defendant Sterling Logistics Corporation ("Sterling"). (Docs.55, 53, 64.) Because the court concludes that the Waerings' common law claims are not preempted by the Hazardous Materials Transportation Authorization Act of 1994, 49 U.S.C. § 5101 *et seq.,* and that genuine issues of material fact exist as to whether BASF was negligent or should be held strictly liable, BASF's motion for summary judgment will be denied. However, in light of the paucity of evidence in the record against either Golden or Sterling, the court will grant summary judgment to these two parties.

### I.

Plaintiff Paul Waering was and remains employed as a forklift operator at Casket Shells, Inc. in Eynon, Pennsylvania. On the morning of December 10, 1998, Waering met a Golden tractor-trailer at the Casket Shells loading area for the purpose of unloading copper sheets from the truck. Though the driver of the truck presented Waering with a shipment manifest indicating that Casket Shells was to receive two crates of copper sheets, Waering alleges that he was not warned either by the paperwork he was shown or by the truck's driver that the truck also contained a shipment of potassium metabisulfite manufactured by BASF. As it turned out, Golden had picked up the potassium metabisulfite at a Sterling warehouse in Illinois for delivery to a BASF customer in New Jersey. The potassium metabisulfite was contained in bags piled on two pallets situated towards the front of the trailer, and was to be delivered to New Jersey as soon as Casket Shells unloaded its copper sheets.

Waering has offered the following account of his exposure to the potassium metabisulfite. After the truck was properly positioned in the open air unloading area, Waering drove his forklift into the truck to remove the first crate of copper, located in the rear of the truck approximately seven feet from the doors. While in the truck, he noticed a foreign taste in his mouth and a strange odor which he could only describe as "like nothing I'd ever smelled before." From his seat on the forklift Waering could see over the one foot high crate to the second crate, which lay two or three feet further from the truck doors. He also observed the pallets of bagged potassium metabisulfite a few feet beyond the second crate. The white bags, which were piled three or four feet high and partially covered in shrink wrap, did not appear to be damaged.

Upon removing the first crate, Waering mentioned to the driver that there was a strange smell in the truck. The driver agreed that the truck had a strange smell. Waering believes—though he is unsure—that he also asked the driver about the cause of the smell. Regardless of whether Waering inquired, the driver did not provide any further information, and Waering did not ask to see any written information concerning the contents of the white bags. Instead, Waering re-entered the truck to retrieve the second crate of copper.

As Waering was backing out of the truck with the second crate, his nose began to run. He deposited the crate, signed the shipment manifest, and went to a restroom to blow his nose. Immediately after blowing his nose, Waering was overcome by a fit of coughing which increased in intensity until his coworkers became alarmed and rushed him to a hospital. He was successfully treated at the hospital and released later that morning. However, Waering alleges that he has permanently contracted asthma as a result of his exposure.

The Waerings filed the original complaint in this action on June 3, 1999. The following claims form the heart of their lawsuit: 1) that BASF negligently packaged the potassium metabisulfite for shipping; 2) that Golden acted negligently in shipping the chemical; 3) that both defendants negligently failed to warn Waering of the risk of harm from exposure to the substance; and 4) that both defendants are strictly liable for supplying a product which was defective and unreasonably dangerous due to poor packaging and inadequate warnings. On December 10, 1999, this court granted Golden's motion to dismiss the products liability claim against it, finding that Golden was not a "seller" of the potassium metabisulfite under Pennsylvania law and thus not subject to strict liability for the harm the chemical may have caused. (Doc. 23.) The Waerings filed an amended complaint on December 20, 1999, (Doc. 24), and this court granted Golden's motion to join warehouser Sterling as a third-party defendant on February 24, 2000, (Doc. 39). BASF, Golden and Sterling subsequently filed separate motions for summary judgement, arguing that the Waerings' negligence and strict liability claims are preempted by federal law and that the evidence in the record is insufficient to create a genuine issue of material fact. (Docs.55, 53, 64.) Defendants' summary judgment motions are now ripe for disposition by the court.

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law under the uncontested facts. On the other hand, where the parties dispute facts material to the lawsuit, the moving party must establish that the factual dispute is not genuine, that is, that the evidence adduced by the parties is such that no reasonable jury could return a verdict for the nonmoving party under the governing evidentiary standard. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–53, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986).

## II.

BASF, Golden and Sterling first argue that the Waerings' common law claims are preempted by the federal Hazardous Materials Transportation Authorization Act of 1994, codified at 49 U.S.C. § 5101 *et seq.* and sometimes referred to as the Hazardous Materials Transportation Act (HMTA). The HMTA expressly preempts any state law "about" the subject of "packing, repacking, handling, labeling, marking and placarding of hazardous material" which "is not substantively the same as a provision of this [Act] or a regulation proscribed under this [Act]." 49 U.S.C. § 5125(b)(1)(B). The Act authorizes the Secretary of Transportation to designate materials as hazardous and to promulgate regulations governing their safe transportation. *See* 49 U.S.C. § 5103. Because potassium metabisulfite is not listed on the

Department of Transportation's Hazardous Materials List, *see* 49 C.F.R. § 172.101, Defendants argue that common law claims springing from improper packing, handling or labeling of potassium metabisulfite would place requirements on regulated parties different from those imposed under the HMTA. Therefore, the argument goes, such common law claims are preempted by § 5125.

The Supremacy Clause of Article VI of the Constitution operates to make any state law that conflicts with federal law "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 2128, 68 L.Ed.2d 576 (1981). In deciding whether a state law has been preempted by federal law, the touchstone of the court's analysis is the purpose and intent of Congress. *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). However, where Congress has enacted a provision which expressly addresses the preemption of state law, the court need not look beyond the language of that provision to ascertain Congress' intent. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992).

In *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Supreme Court considered whether the preemption provision of the Medical Device Amendments of 1976(MDA) preempted common law negligence and strict liability claims arising from the malfunction of the plaintiff's pacemaker. That provision expressly preempts any state "requirement" established "with respect to a device" which differs from a federal requirement, though it grants the Food and Drug Administration the discretion to exempt certain state requirements from preemption. *See* 21 U.S.C. § 360k. Critical to the *Medtronic* court's analysis was the fact that the feder-

al regulations in question were general in nature and did not reflect a decision by the federal government as to the specifics of how pacemakers should be labeled or manufactured. 518 U.S. at 494–95, 501, 116 S.Ct. at 2254, 2258. Further, the plaintiffs' claims in *Medtronic* were not founded on state requirements specifically aimed at the manufacture and labeling of medical devices, but on the general common law doctrines of negligence and strict liability, doctrines not limited to the medical device context nor developed "with respect to" medical devices. *Id.* The high court reasoned:

> The legal duty that is the predicate for the [plaintiffs'] negligent manufacturing claim is the general duty of every manufacturer to use due care to avoid foreseeable dangers in its products. Similarly, the predicate for the failure to warn claim is the general duty to inform users and purchasers of potentially dangerous items of the risks involved in their use. These general obligations are no more threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force. These state requirements therefore escape preemption, not because the source of the duty is a judge-made common law rule, but rather because their generality leaves them outside the category of requirements that [the preemption provision] envisioned to be 'with respect to' certain devices such as pacemakers.

*Id.*

The lesson of *Medtronic* is a simple one: general federal requirements for medical devices do not preempt general common law claims. The Third Circuit indicated that this rule governs preemption outside the scope of the Medical Device Amend-

ments by applying it to the preemption clause of the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136 *et seq.* *See Hawkins v. Leslie's Pool Mart, Inc.,* 184 F.3d 244 (3d Cir.1999). That provision, which is similar to the preemption provision at issue in Medtronic, explicitly preempts all state "requirements" for the packaging or labeling of pesticides that differ from those of the federal government. *See* 7 U.S.C. § 136v. In applying *Medtronic* to FIFRA's preemption provision, the Third Circuit summarized the holding in *Medtronic* as follows: "We read *Medtronic* as instructing that *only when* the 'Federal Government has weighed the competing interests ... [and] reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case ... and implemented that conclusion via a specific mandate' are general state common-law claims preempted." *Hawkins,* 184 F.3d at 254 (emphasis in original) (quoting *Medtronic,* 518 U.S. at 501, 116 S.Ct. at 2258).

The doctrine expounded in *Medtronic* and *Hawkins* is equally applicable to preemption under the HMTA's preemption provision, 49 U.S.C. § 5125. Like the preemption provisions examined in *Medtronic* and *Hawkins,* § 5125 preempts all requirements concerning the subject matter of the *federal* statute that differ from those of the federal government. *See* 21 U.S.C. § 360k(a) (MDA); 7 U.S.C. § 136v(b) (FIFRA); 49 U.S.C. 5125(b)(1) (HMTA). Moreover, the HMTA delegates the authority to craft specific regulations to the administrative agency charged with enforcing the statute, just as do the MDA and FIFRA. *See* 49 U.S.C. § 5103 (HMTA); 21 U.S.C. §§ 360c, 360d, 360e, 360f, 360h (MDA); 7 U.S.C. § 136w (FIFRA). Consequently, the court concludes that the HMTA will not preempt a state common law claim unless the "Federal

Government has weighed the competing interests ... [and] reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case ... and implemented that conclusion via a specific mandate." *Hawkins,* 184 F.3d at 254 (quoting *Medtronic,* 518 U.S. at 501, 116 S.Ct. at 2258).

The federal government has not reached such a conclusion, nor issued any specific mandate, with regard to the packaging, labeling and transportation of potassium metabisulfite. As Defendants themselves pointed out, the Department of Transportation has not designated potassium metabisulfite a hazardous substance subject to regulation under the HMTA. *See* 49 C.F.R. § 172.101. Nor have Defendants presented any evidence that the federal government has elsewhere "weighed the competing interests ... [and] reached an unambiguous conclusion about how those competing considerations should be resolved" with regard to potassium metabisulfite. Critically, Defendants have presented no evidence that the federal government has weighed the competing considerations and decided that the transportation of potassium metabisulfite should be free of all regulation. Under *Medtronic* and *Hawkins,* the federal government's apparent silence with respect to this chemical is simply not enough to support the inference that Congress intended section 5125 to preempt state common law causes of action.

By way of contrast, where the substance in question *has* been placed on the Hazardous Materials List, the extensive regulations promulgated by the Department of Transportation will typically preempt differing state laws, especially those which specifically target the transportation of hazardous materials. *See, e.g., Chlorine Institute, Inc. v. California Highway Patrol,* 29 F.3d 495 (9th Cir.1994) (HMTA preempts the California Highway Patrol's

specific and detailed regulations governing the transportation of chlorine in California); *Northern States Power Company v. Prairie Island Mdewakanton Sioux Indian Community*, 991 F.2d 458 (8th Cir. 1993) (HMTA preempts an Indian tribe's requirement that shippers obtain a special license for each shipment of radioactive substances that will cross tribal lands). In the present matter, however, the court is unaware of a single federal regulation pertaining to the manufacture, packaging or labeling of potassium metabisulfite. Further, the common law duties at issue in the instant case do not apply in any particular way to transporters of dangerous chemicals. The Waerings' negligence claims are based on the general duty, applicable to all persons, to exercise due care to avoid creating an unreasonable risk of harm to others. Likewise, the Waerings' strict liability claims are based on the duty of all manufacturers to sell products free of defects that render them unreasonably dangerous. Consequently, *Medtronic* and *Hawkins* dictate that the Waerings' common law claims escape preemption.

This conclusion is consistent with Congress' stated purpose in enacting the HMTA, which was "to provide adequate protection against the risks to life and property inherent in the transportation of hazardous material in commerce by improving the regulatory and enforcement authority of the Secretary of Transportation." 49 U.S.C. § 5101. As this statement indicates, the purpose of the HMTA is to protect life and property. However, the HMTA itself did not create any private right of action, merely authorizing regulatory action and civil actions initiated by the Secretary of Transportation. See 49 U.S.C. §§ 5103, 5121–23. Were Defendants' view of § 5125 accepted, that provision would preempt common law actions arising out of the transportation of dangerous but non-"hazardous" materials, leaving those harmed by such materials without any remedy for their personal injuries, property damage, and loss of life. Congress' express purpose of protecting life and property makes it exceedingly unlikely that § 5125 was intended to sweep so broadly. As the Supreme Court has twice noted, "[i]t is, to say the least, 'difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.' *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984)." *Medtronic*, 518 U.S. at 487, 116 S.Ct. at 2251.

In an effort to avoid this conclusion, Defendants cite the cases of *Cipollone v. Liggett Group, Inc.*, cited *supra*, and *Lescs v. William R. Hughes, Inc.*, 168 F.3d 482, 1999 WL 12913. In *Cipollone*, the Supreme Court held that the Public Health Cigarette Smoking Act of 1969, though not preempting most of the plaintiffs' common law claims, did preempt their failure to warn claim. 505 U.S. at 524, 544, 112 S.Ct. at 2621, 2632. However, in that case the federal government had made a specific determination with regard to the warning that must be given to purchasers of cigarettes. In fact, Congress specified in the statute itself the exact words which must be placed on each pack of cigarettes. *See id.*, 505 U.S. at 514, 112 S.Ct. at 2616. Consequently, *Cipollone*, unlike the present case, involved specific federal regulations.

*Lescs* is likewise inapposite, and for the same reason. In *Lescs*, the Fourth Circuit held that its decision in *Worm v. American Cyanamid Co.*, 5 F.3d 744 (4th Cir.1993) ("*Worm II*"), which held that FIFRA preempts state common law claims related to the labeling or packaging of pesticides, survived the Supreme Court's *Medtronic* decision. The specific holding of *Worm II*, however, was that "the comprehensive na-

ture of the FIFRA labeling process ... dictates the preemption of any state common law cause of action that rests on an alleged failure to warn or communicate information about a product through its labeling." *Id.* at 747. Thus FIFRA's specific, concrete requirements for the labeling of pesticides justified a finding that the Act preempted common law failure to warn claims. These specific federal requirements make *Lescs* and *Worm II* analogous to *Cipollone* and distinguishable from the present case. As noted above, the federal government has not "weighed the competing interests ... [and] reached an unambiguous conclusion about how those competing considerations should be resolved" with regard to potassium metabisulfite. *See Hawkins,* 184 F.3d at 254.

In determining whether a federal statute preempts a particular state law, the court starts from the presumption "that the historic police powers of the States [are] not to be superceded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic,* 518 U.S. at 485, 116 S.Ct. at 2250. As a consideration of the governing precedents and the express purpose of Congress in enacting the HMTA reinforces, rather than rebuts, this presumption, the court holds that none of the Waerings' common law claims are preempted by the Hazardous Materials Transportation Authorization Act of 1994.

### III.

Turning to the individual claims in the case, the court is confronted with several arguments by BASF that it is entitled to summary judgment on the Waerings'

strict liability claims of defective packaging and failure to warn. In the first place, BASF avers that the Waerings' strict liability packaging claim is supported by no evidence whatsoever that the potassium metabisulfite was defectively packaged at the time it passed out of BASF's control. (Brief, Doc. 58 at 21.) However, the Waerings have produced evidence that BASF has improperly packaged potassium metabisulfite in the past, leading to the escape of strong odors. (See Plaintiff's Exhibit 11, Doc. 62.)[1] There is also documentary evidence that third parties have recommended to BASF that it utilize thicker bags. (Id.) In addition, Paul Waering's account of his alleged exposure to the chemical, including his testimony that the bags of potassium metabisulfite did not appear to be damaged, constitutes circumstantial evidence that the bags utilized by BASF rendered the chemical defective and unreasonably dangerous. *See Rogers v. Johnson & Johnson Products, Inc.,* 523 Pa. 176, 565 A.2d 751, 753 (1989) ("a plaintiff [may] prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction.") This evidence suffices to create a genuine issue of material fact as to whether the potassium metabisulfite left BASF's control in a defective condition.

Waering's testimony that the bags did not appear damaged also disposes of another BASF argument, that is, that there is insufficient evidence of causation because "plaintiffs have failed to rule out that the damage occurred during the month-and-a-half storage period at Sterling or

---

1. BASF correctly argues that evidence of similar accidents is admissible only if the accidents are "substantially similar" to one another. *See Barker v. Deere and Co.,* 60 F.3d 158, 162–63 (3d Cir.1995). However, BASF has presented no evidence in support of its claim that the prior accidents "involved completely different bags than those at issue in this case." (Reply Brief, Doc. 68 at 9.)

during the transport by Golden." (Doc. 58 at 24.) BASF is correct evidence of mishandling by Golden or Sterling would 1) undercut the jury's ability to infer that BASF negligently packaged its product, and 2) undercut the Waerings' ability to show that any negligent packaging by BASF was a but-for cause of the alleged harm. But not only is there an utter absence of evidence of mishandling, but Waering's testimony that the bags appeared undamaged is affirmative evidence that no mishandling occurred. Consequently, should a jury credit both Waering's testimony and his documentary evidence, it could reasonably conclude that he was exposed to the potassium metabisulfite, that the potassium metabisulfite was defectively packaged, and that the defective packaging was a cause of the exposure.

■ BASF also challenges the Waerings' strict liability failure to warn claim, asserting that the Waerings cannot prove that Paul Waering would have heeded a warning even had one been given.[2] The Waerings' strict liability failure to warn claim is founded on the Materials Safety Data Sheet (MSDS) prepared by BASF, which sets forth the health risks associated with exposure to potassium metabisulfite. These health risks include "respiratory arrest, unconsciousness, and coma." (MSDS, Plaintiffs Exhibit 5, Doc. 62.) The Waerings assert that BASF should have ensured that a copy of the MSDS was

provided to every person who might come in contact with the potassium metabisulfite. BASF responds that the Waerings cannot establish that Paul Waering would have heeded a warning, since he did not request an MSDS on the day in question— indeed, he had never before requested a MSDS prior to unloading a shipment—and since he reentered the Golden truck even after he noticed the unusual smell. (Doc. 58 at 26–27.)

BASF's argument improperly assumes that Waering would have been required to ask for the MSDS. While the fact that Waering did not request to see an MSDS is a compelling one, it is the Waerings' position that it would not have been necessary for Paul Waering to ask for an MSDS had BASF acted properly. According to the Waerings, BASF should have ensured that Paul Waering was shown an MSDS before he began unloading the copper from the truck.

The Waerings' theory is flawed insofar as it posits that BASF was obligated to ensure that all persons in the stream of commerce are supplied with an MSDS. (Doc. 61 at 23.) In light of the serious risks associated with potassium metabisulfite, BASF was obligated, in order to ensure that its product was not unreasonably dangerous, to provide Sterling with a copy of the MSDS or comparable written warnings with the paperwork accompanying the shipment.[3] However, the Waerings' protestations notwithstanding, BASF was not

---

**2.** The Pennsylvania Supreme Court has stated that, as with all strict liability claims, "a plaintiff raising a failure to warn claim must establish only two things: that the product was sold in a defective condition 'unreasonably dangerous' to the user, and that the defect caused plaintiff's injury." *Phillips v. A–Best Products, Co.,* 542 Pa. 124, 665 A.2d 1167, 1171 (1995) (footnotes and citations omitted). However, to establish the causation element in a strict liability claim based on failure to warn, "the plaintiff must demon-

strate that the user would have avoided the risk had he or she been warned of it by the seller." *Id.*

**3.** Because one is already at risk of exposure when close enough to read the labels on the bags, warning labels alone are not enough to prevent the product from being unreasonably dangerous. The requisite warnings must be included in the accompanying paperwork.

required "to provide a copy of the MSDS to all those who would be exposed to the chemical or material in the stream of commerce." (Brief, Doc. 61 at 23.) [4]

Nevertheless, the court finds that there is a genuine issue of material fact here as to whether Waering would have been presented with a copy of the MSDS along with the shipment manifest had BASF provided copies of the document to Sterling. This factual question depends on whether Sterling would have forwarded copies of the MSDS to Golden and whether Golden, in turn, would have had its driver show the document to Waering. If the Waerings prove that it is more likely than not that both of those events would have occurred, they will have proved factual causation despite the fact that Waering never asked Golden's driver for an MSDS.

Accordingly, BASF's motion for summary judgment will be denied as to the Waerings' strict liability claims.[5]

## IV.

Defendants also assert that the Waerings' negligence claims cannot survive summary judgment. Attacking the Waerings' negligent failure to warn claim, BASF cites OSHA regulations in order to establish that it had no duty to warn Waering of the dangers associated with exposure to potassium metabisulfite. (Doc. 68 at 13.) However, the Waerings are not proceeding on a negligence *per se* theory. In order to establish their negligent failure to warn claim against BASF, the Waerings need only prove the three elements of § 388 of the Restatement

4. Applying the "Wade factors" set forth in *Dambacher v. Mallis*, 336 Pa.Super. 22, 485 A.2d 408, 423 n. 5 (1984), the court rejects the contention that BASF's potassium metabisulfite is unreasonably dangerous unless every person who might come into contact with the chemical is provided an MSDS or comparable warnings. *See generally Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1046 (3rd Cir.1997). In light of the fact that the Department of Transportation declined to designate potassium metabisulfite a "hazardous" substance, the likelihood of injury and its probable magnitude (the second Wade factor) cut against placing the risk of loss on BASF. The likelihood of injury is further reduced by the fact that those to whom BASF transfers the chemical, once warned in writing, are reasonably likely to pass on such warnings, if only to avoid liability for negligence. Further, under the fourth factor, it would be exceedingly difficult for BASF to ensure that all parties who may come into contact with the chemical, even those of whom BASF is utterly unaware, are provided copies of the warnings. *See id. See also Persons v. Salomon North America, Inc.*, 217 Cal.App.3d 168, 176, 265 Cal.Rptr. 773 (1990) (declining to apply strict liability to manufacturer who warned only the intermediate purchaser, where manufacturer had "no effective way to convey product warnings to the ultimate consumer"). Consequently, the

court concludes as a matter of law that: 1) BASF may be subject to strict liability for failure to provide written warnings to the party receiving the potassium metabisulfite from BASF, namely, Sterling; 2) BASF may be held strictly liable for failure to provide such warnings to those with whom BASF has contracted to ship or store the chemical, which again was Sterling; but 3) BASF may not be held strictly liable for the failure to provide an MSDS or comparable written warnings to other persons.

5. On December 10, 1999, this court granted Golden's motion to dismiss the Waerings' strict products liability claims, finding that Golden, as a mere shipper of the product in question, was not a "seller" of the chemical subject to strict liability in Pennsylvania. (Doc. 23.) At that time, Sterling was not a party to this case.

Because the reasoning of the court's December 1999 order applies with equal force to Sterling, that party's motion for summary judgment will be granted with respect to the Waerings' strict products liability claims. *See generally Francioni v. Gibsonia Truck Corp*, 472 Pa. 362, 369, 372 A.2d 736 (1977). Sterling is simply a warehouser and shipper of the potassium metabisulfite, not a member of its marketing chain. As such, it is not a "seller" of the potassium metabisulfite.

(Second) of Torts: 1) that the defendant knew or had reason to know that the chattel was or likely would be dangerous for the use for which it was supplied; 2) that the defendant had no reason to believe that those for whose use the chattel was supplied would recognize the dangerous condition; and 3) that the defendant failed to exercise reasonable care to inform those persons of the danger. *See Overbeck v. Cates*, 700 A.2d 970, 972 (Pa.Super.1997). Whether BASF has discharged its duty of reasonable care is a question for the jury to decide at trial. *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174, 182 (3d Cir.1976) (also setting forth factors for jury to consider in deciding whether the defendant has discharged his duty by warning an intermediary). On the other hand, both Golden and Sterling are entitled to summary judgment on the Waering's negligent failure to warn claims. No evidence has been presented either by the Waerings or by BASF that these parties knew or had reason to know of the dangerousness of the potassium metabisulfite. In fact, it seems that these parties had no reason to know anything at all about the chemical once they confirmed that it was not on the Department of Transportation's Hazardous Materials List. In particular, there is no evidence that either party ever received a copy of the MSDS or, lacking one, had an obligation to request one from BASF. Accordingly, both parties are entitled to summary judgment on the Waerings' negligent failure to warn claims.

■ With respect to the Waerings' negligent packaging claim against BASF, BASF simply cites the arguments it raised against the Wearings' strict liability defective packaging claims. (Doc. 58 at 28.) Those arguments are as unavailing here as they were in the strict liability context. *See supra* at 683. It is clear that BASF had a duty to Waering and others who might be working near the potassium metabisulfite to exercise reasonable care in packaging it. *See generally In re TMI*, 67 F.3d 1103, 1117 (3d Cir.1995) (setting forth the traditional elements of negligence and holding that the existence of a duty and the appropriate standard of conduct are matters of law for the court). Therefore, the Waerings are entitled to recover on their negligent packaging claim if they can prove that BASF breached its duty of due care, that the Waerings were harmed by the breach, and that BASF's breach proximately caused that harm. *See id.* Because the Waerings have adduced sufficient circumstantial evidence to allow a jury to reasonably infer that BASF negligently packaged the potassium metabisulfite, their negligent packaging claims will proceed to trial.

■ It is a closer question whether Golden and Sterling are entitled to summary judgment on the Waerings' claims that they acted negligently in handling or shipping the potassium metabisulfite. The only evidence adduced by the Waerings on these claims is the circumstantial evidence of the accident itself. Thus the Waerings are relying on a pure *res ipsa loquitur* theory, which in Pennsylvania is governed by section 328D of the Restatement (Second) of Torts, which states:

It may be inferred that the harm suffered by the plaintiff is caused by the negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

Restatement (Second) of Torts § 328D(1) (1965). *See Gilbert v. Korvette, Inc.,* 457 Pa. 602, 612–13, 327 A.2d 94 (Pa.1974) (adopting § 328D). The doctrine of *res ipsa loquitur* is neither procedural nor substantive, but "only a shorthand expression for circumstantial proof of negligence—a rule of evidence." *Id.* at 611, 327 A.2d 94.

The employment of *res ipsa loquitur* is problematic where, as here, there are several defendants who had successive control over the harm-causing instrumentality and there is no reason to believe that more than one defendant is responsible for the harm. In such cases, the other defendants are "other responsible causes" that must be sufficiently eliminated in order for it to be more likely than not that the remaining defendant is responsible for the harm. *See* William L. Prosser, Handbook of the Law of Torts § 39, at 251 (4th ed. 1971) ("Unless there is vicarious liability or shared control, the logical rule usually is applied, that the plaintiff does not make out a preponderant case against either of two defendants by showing merely that the plaintiff has been injured by the negligence of one or the other"); *Loncosky v. Wal–Mart Stores, Inc.,* 1997 WL 732465 (E.D.Pa.) (a jury could not reasonably infer that the store owner was responsible for the faulty door handle, where there was no admissible evidence tending to exclude other causes such as the manufacturer or other store patrons); *Menard v. Ford Brazil, S.A.,* 89 F.R.D. 452, 453 (E.D.Pa.1981) (the evidence must eliminate all defendants other than the wrongdoer where the complaint names "a series of defendants, each of which had, for some identifiable period of time, exclusive control over the instrumentality"); *Esco Oil & Gas, Inc. v. Sooner Pipe & Supply Corp.,* 962 S.W.2d 193, 195 (Tex.App.1998) ("The doctrine of *res ipsa loquitur* is not available to fix responsibility when any one of

the multiple defendants, wholly independent of each other, might have been the responsible party"); *Huggins v. John Morrell & Co.,* 176 Ohio St. 171, 198 N.E.2d 448, 455 (1964) ("generally it has been held that *res ipsa* is not applicable against multiple defendants ... where the wrongdoer, among several possible, was not identified"); *Samson v. Riesing,* 62 Wis.2d 698, 708, 215 N.W.2d 662 (1974). Therefore, because the Waerings and BASF have not presented direct evidence of negligent handling or shipping by Golden or Sterling, and because "other responsible causes" have not been sufficiently eliminated to allow a jury to reasonably infer the negligence of either one from the mere fact of the accident, both Golden and Sterling are entitled to summary judgment on the remaining negligence claims against them.

■ The court recognizes that BASF might make a similar argument, reasoning that the existence of Golden and Sterling as other possible causes of the escape of the potassium metabisulfite precludes the inference that BASF was negligent in its packaging of the chemical. However, BASF and the *other two defendants* are not similarly situated for purposes of *res ipsa loquitur.* While the Waerings have produced documentary evidence tending to prove that BASF has previously experienced problems with the packaging of its potassium metabisulfite, there is no evidence other than the fact of the accident itself that either Sterling or Golden acted negligently. The additional circumstantial evidence against BASF, in conjunction with the absence of additional evidence against the other two defendants, makes it possible, though not necessary, for a jury to infer that BASF was more likely than not the negligent party.

Numerous courts have allowed the use of *res ipsa* against one possible wrongdoer but not against another where the evidence made it more likely than not that a particular party was responsible for the harm. *See, e.g., De Witt Properties, Inc. v. City of New York,* 44 N.Y.2d 417, 426–27, 406 N.Y.S.2d 16, 377 N.E.2d 461 (N.Y. 1978) (where evidence beyond the fact of the accident implicated one of two defendants as the wrongdoer, the jury could infer negligence on the part of that defendant, but could not apply *res ipsa* to the other defendant); *Higginbotham v. Mobil Oil Corp.,* 545 F.2d 422, 430 (5th Cir.1977) ("the application of res ipsa to one defendant and not to another requires that the circumstances surrounding the injury render it more probable that the injury was due to that defendant's negligence, than that of the other defendant"); *Parrillo v. Giroux Company, Inc.,* 426 A.2d 1313, 1320 (R.I.1981) (in a case involving an exploding bottle of grenadine, allowing res ipsa against the manufacturer but not against distributor); *Giant Food, Inc. v. Washington Coca–Cola Bottling Company, Inc.,* 273 Md. 592, 332 A.2d 1 (1975). In all such cases, evidence beyond the fact of the accident tends to implicate one defendant or exonerate the others, allowing the fact-finder to infer negligence on the part of one party despite the existence of other possible wrongdoers. Because such evidence is present in the instant case, a reasonable jury could infer that Paul Waering's exposure was due to BASF's negligence, despite the theoretical possibility that either Golden or Sterling was the responsible party.

## V.

By way of summary, the court holds that the federal Hazardous Materials Transportation Authorization Act does not preempt the Waerings' common law negligence and strict liability claims. The court further holds that genuine issues of material fact exist as to the Waerings' claims of strict liability packaging, strict liability failure to warn, negligent packaging and negligent failure to warn against Defendant BASF. However, the dearth of evidence in the record against Defendant Golden and Third–Party Defendant Sterling leaves no genuine issue of material fact with respect to these to parties. Accordingly, the court will grant summary judgment to Golden and Sterling on all the remaining claims against them.