[No. C048336. Third Dist. Aug. 2, 2006.]

THE PEOPLE, Plaintiff and Appellant, v.
UNION PACIFIC RAILROAD COMPANY et al., Defendants and
Respondents.

## COUNSEL

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Susan S. Fiering and Harrison M. Pollak, Deputy Attorneys General, for Plaintiff and Appellant.

Law Office of Stevens & O'Connell, Craig C. Allison; Michael L. Whitcomb, Joseph P. Mascovich; Reed Smith and Joseph P. Mascovich for Defendant and Respondent Union Pacific Railroad Company.

Morrison & Foerster, Andrew B. Sabey and Robin S. Stafford for Defendant and Respondent Chemical Lime Company of Arizona.

## OPINION

**SCOTLAND, P. J.**—The People of the State of California filed a civil complaint against the Union Pacific Railroad Company (Union Pacific) and the Chemical Lime Company of Arizona (Chemical Lime) based upon the spillage of substantial quantities of calcium oxide into the environment.

Demurrers were sustained without leave to amend and the complaint was dismissed because the trial court concluded the People's claims are pre-

empted in their entirety by the federal Hazardous Materials Transportation Authorization Act of 1994 (HMTA) (49 U.S.C. § 5101 et seq.) and the Federal Railroad Safety Authorization Act of 1994 (FRSA) (49 U.S.C. 20101 et seq.).[1] The People appeal from the judgment of dismissal.

 We shall reverse the judgment and remand the matter for further proceedings. As we will explain, the state requirement of immediate verbal notification of the spill of calcium oxide and the imposition of a civil penalty for its violation are not preempted by federal law. Also not preempted by federal law is liability for remedial measures, such as abatement, cleanup, assessment and remediation of environmental injury, and consequential damages. However, the imposition of civil penalties for the alleged failure to train employees and for the fact of the spillage itself are preempted by federal law.

## BACKGROUND

*Facts*

This action was commenced by the district attorneys of five counties, San Joaquin, Stanislaus, Merced, Madera, and Sacramento. In reviewing a judgment of dismissal entered after the sustaining of a demurrer, we accept as true the factual allegations of the complaint. (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 238 [282 Cal.Rptr. 233].) The complaint reflects the following facts:

Union Pacific owns and maintains a railroad right-of-way, referred to as the I-5 corridor, that passes through Madera, Merced, Stanislaus, San Joaquin, and Sacramento Counties. The rail line is adjacent to and crosses over numerous waterways.

On December 27, 2001, a railcar being transported by Union Pacific spilled a white substance along the I-5 corridor for at least 175 miles from Madera County through Sacramento County. The San Joaquin County Sheriff's Department was the first to respond to the spill. Initial field tests indicated the substance could be a highly caustic hazardous substance. Public health officials and law enforcement closed roadways and evacuated a skate park due to its proximity to the railroad tracks. Subsequent testing revealed the substance was calcium oxide, known as lime or quicklime.

---

[1] The trial court also relied in part on the commerce clause of the United States Constitution (U.S. Const., art. I, § 8, cl. 3). On appeal, however, defendants in effect abandon the commerce clause as a basis upon which to affirm the judgment. Therefore, we will not address it.

Union Pacific delayed nearly four hours after learning of the spill before contacting the Office of Emergency Services. Union Pacific did not otherwise notify appropriate agencies of the spill. Although it was aware the spill extended as far south as Madera County, Union Pacific did not inform Madera County officials. Moreover, Union Pacific did not remove or otherwise dispose of the spilled lime, and it did not identify the railcar that spilled the lime.

Another such incident occurred on February 21, 2002. Chemical Lime owns a railcar, designated No. NRLX 46356, that it uses for transportation of lime. Union Pacific was transporting this railcar from Airoline, Nevada to Ortega, California, located in San Joaquin County. At some point, the railcar began spilling lime. A citizen called in a complaint that a white powder was "leaking heavily" from a railcar on a northbound train. The citizen added that there was a large cloud of dust associated with the leak. Union Pacific was notified of the complaint and stopped the train in Chowchilla.

The conductor and engineer of the train observed that railcar NRLX 46356 was carrying lime and that the railcar behind it was coated in a white substance. The conductor notified Union Pacific's dispatch office that the railcar was spilling lime. The conductor was directed to proceed without repair. Union Pacific did not notify the Office of Emergency Services or any local emergency responders of the spill.

The railcar continued to spill significant amounts of lime as the train proceeded northbound. Outside of Turlock, about 40 miles north of Chowchilla, Union Pacific was again notified of the spill. The conductor contacted dispatch and suggested that the train stop at the next siding, which was about three miles ahead. But the conductor was directed to proceed without repair to the Stockton rail yard, which was another 45 miles ahead. Railcar NRLX 46356 spilled approximately 15 tons of lime between Madera County and the Stockton rail yard.

Union Pacific did not make any notification of the spill until many hours after it became aware of the spill. When it did make notification, it told the Madera Environmental Health Department that the substance was limestone, which is much less caustic than lime. Union Pacific has refused to conduct any cleanup of the spilled lime.

Lime is a potentially dangerous substance. Exposure to lime can result in irritation to the eyes, skin, and upper respiratory tract, ulceration or perforation of the nasal septum, pneumonia, and dermatitis. When lime is mixed

with water, it can generate significant heat that may be sufficient to ignite combustible materials. Powdered lime mixed with water can react with explosive violence.

### Legal Requirements

■ Under the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. § 6901 et seq.), a hazardous waste is a material that, because of its quantity, concentration, or physical, chemical, or infectious characteristics may "cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness," or may "pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." (42 U.S.C. § 6903(5).)

■ RCRA directed the federal Environmental Protection Agency (EPA) to establish criteria for identifying hazardous wastes and to establish lists of materials that constitute hazardous wastes. (42 U.S.C. § 6921.) The lists of specific hazardous materials established by the EPA are not all-inclusive. A material that meets the criteria of a hazardous waste is a hazardous waste even though it is not on the lists of specific hazardous wastes. (40 C.F.R. § 261.3(a)(2)(i) (2005); 61C Am.Jur.2d (1999) Pollution Control, § 1152, p. 306.)

■ RCRA authorizes states, with approval of the EPA, to establish their own programs in lieu of federal regulation, provided that state requirements are not less stringent than federal standards. (42 U.S.C. §§ 6926, 6929.) Pursuant to such authority, California's Legislature enacted a program for hazardous waste control. (Health & Saf. Code, § 25100 et seq.)

Under California's program, the Department of Toxic Substances Control has determined that calcium oxide, i.e., lime, meets the EPA's corrosivity criteria as a hazardous waste and has been listed as number 171, in appendix X, chapter 11, division 4.5, title 22, following section 66261.126, of the California Code of Regulations.[2]

The spillage of lime implicates a number of state statutory provisions.

---

[2] Calcium oxide is identified as a corrosive hazardous waste because of its high pH. (Cal. Code Regs., tit. 22, § 66261.22.) A material that consists of or contains a chemical listed in appendix X is presumed to be a hazardous material and is also presumed to be a RCRA hazardous material. (Cal. Code Regs., tit. 22, § 66261.100, subd. (b).)

■ Fish and Game Code section 5650, subdivision (a)(4) makes it unlawful to deposit lime in, permit lime to pass into, or place lime where it can pass into, the waters of this state. Section 5650.1 of the Fish and Game Code provides for civil penalties and injunctive relief for violations. Section 12015, subdivision (b) of that code imposes a cleanup obligation upon anyone who pollutes, contaminates, or obstructs, or who deposits or discharges materials threatening to pollute, contaminate, or obstruct, the waters of the state to the detriment of fish, plant, bird, or animal life in those waters.

■ Health and Safety Code section 25189, subdivision (d) imposes a civil penalty upon anyone who negligently disposes or causes the disposal of hazardous waste at a point that is not authorized.[3] Section 25189.2, subdivision (c) of the Health and Safety Code imposes a civil penalty upon the unintentional and nonnegligent disposal of hazardous waste. Section 25189.1, subdivision (a) of that code imposes civil liability for costs incurred by state or local governments in assessing and remedying damage to natural resources from the unlawful disposal of hazardous waste.

■ Health and Safety Code section 25507, subdivision (a) requires that any handler of hazardous materials immediately report a release or threatened release of the material. Handlers of hazardous material are required to have a plan for responding to the release or threatened release of the material and to train employees in safety procedures in the event of such a release or threatened release. (Health & Saf. Code, §§ 25503.5, subd. (a), 25504.) Sections 25514 and 25516 of the Health and Safety Code provide for civil penalties and injunctive relief for violations.

■ Public Utilities Code section 7672.5 requires any railroad corporation involved in an incident resulting in a release or threatened release of a hazardous material to immediately report the type and extent of the release or threatened release in the manner specified in Health and Safety Code section 25507. Section 7724.5 of the Public Utilities Code provides civil penalties for, among other things, engaging in or causing the discharge or spill of a hazardous commodity from a railcar.

■ Civil Code section 3479 provides that anything that is injurious to health, is indecent or offensive to the senses, or is an obstruction to the free

---

[3] The disposal of hazardous waste includes "[t]he discharge, deposit, injection, dumping, spilling, leaking, or placing of any waste so that the waste or any constituent of the waste is or may be emitted into the air or discharged into or on any land or waters, including groundwaters, or may otherwise enter the environment." (Health & Saf. Code, § 25113, subd. (a)(1).) This definition closely parallels the RCRA definition of disposal. (42 U.S.C. § 6903(3).) Our state provision adds abandonment of any waste to the definition of disposal. (Health & Saf. Code, § 25113, subd. (a)(2).)

use of property, is a nuisance. A nuisance is a public nuisance when it affects at the same time an entire community or neighborhood, or any considerable number of persons. (Civ. Code, § 3480.) The remedies for a public nuisance are indictment or information, a civil action, or abatement. (Civ. Code, § 3491.)

 Civil Code section 1714, subdivision (a) specifies that everyone is responsible for injury occasioned by the want of ordinary care or skill in the management of his or her property or person.

 The Water Code makes it unlawful to discharge pollutants, including hazardous materials, into the navigable waters of this state. (Wat. Code, §§ 13376, 13387.)

 Business and Professions Code sections 17200 to 17208 prohibit unfair competition, including unlawful business practices. (*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 515 [128 Cal.Rptr.2d 463].) In this sense, an unlawful business practice "borrows" violations of other laws and treats the violations as unlawful business practices when committed pursuant to business activity. (*Ibid.*) Virtually any state, local, or federal law can serve as a predicate for an unlawful business practice claim. (*Ibid.*)

*Case History*

The District Attorneys of Madera, Merced, and Stanislaus Counties filed separate misdemeanor complaints against Union Pacific. In the Madera County proceeding, Union Pacific moved, on the ground of federal preemption, to dismiss the charges that were based upon Health and Safety Code section 25189.5, subdivision (b), Health and Safety Code section 25507, and on Public Utilities Code section 7724. Union Pacific noted that under the federal HMTA, calcium oxide is not regulated for purposes of transportation by rail.[4] Agreeing that certain counts were preempted by the HMTA, the Madera County trial court granted the motion to dismiss those counts. The People filed a notice of appeal and, asserting a need for immediate relief, filed in the appellate department of the superior court a petition for a writ of mandate. That court concluded the remedy of appeal would be adequate and thus denied the petition for writ review.

After this civil proceeding was commenced, the People and Union Pacific agreed that the issues could best be resolved in a joint civil action. Accordingly, the Madera County District Attorney and Union Pacific entered into a

---

[4] Under the HMTA, the federal Department of Transportation regulates calcium oxide for purposes of transportation by air only.

stipulation. The People agreed to dismiss the pending criminal charges and the appeal of the counts that had been dismissed previously. Union Pacific agreed that in any action, including this action, it would not assert res judicata, collateral estoppel, laches, unclean hands, or any other substantive or procedural defense that is based upon the Madera County criminal proceedings. The criminal proceedings in all three counties were dismissed in favor of this civil action.

Both Union Pacific and Chemical Lime demurred to the civil complaint on the ground of federal preemption. Agreeing that each cause of action is barred by federal preemption, the trial court sustained the demurrers without leave to amend and entered a judgment of dismissal.

## DISCUSSION

### I

As grounds for its demurrer, Chemical Lime asserted not only federal preemption but also a claim that the civil complaint against it is barred by collateral estoppel as a result of the Madera County criminal proceeding against Union Pacific. Collateral estoppel precludes a party from relitigating an issue that has been finally determined against it in a prior action. (*Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 828 [88 Cal.Rptr.2d 366, 982 P.2d 229].) In appropriate circumstances, a stranger to the prior litigation may assert collateral estoppel against a party to the prior litigation. (*Id.* at pp. 828–829.)

In the Madera County proceeding, Union Pacific and the People agreed that the criminal charges would be dismissed and the People's appeal would be abandoned, with the stipulation that in any other action, Union Pacific would not assert any procedural defense, including collateral estoppel, based upon the Madera County proceeding.

Chemical Lime argues that because it was not a party to that proceeding, it is not bound by the stipulation and is free to assert collateral estoppel in this action.

We conclude that collateral estoppel does not bar this civil action against Chemical Lime because the motion to dismiss counts in the Madera County criminal proceeding on the ground of federal preemption did not address all the allegations and statutory provisions raised in the subsequent civil action. A demurrer is an all-or-nothing procedure, i.e., a party cannot demurrer to a portion of a cause of action. (*PH II, Inc. v. Superior Court* (1995) 33 Cal.App.4th 1680, 1682 [40 Cal.Rptr.2d 169].) In any event, there

is another reason why it would not be appropriate to permit Chemical Lime to challenge the civil action on the ground of collateral estoppel.

 In the Madera County criminal proceedings, the trial court addressed the preemption issue as a question of law. The court did not consider any evidence or even the factual allegations of the complaint. While the resolution of an issue of law may be given collateral estoppel effect in some circumstances, it will not be considered conclusive if injustice would result or if the public interest requires that relitigation not be foreclosed. (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 622 [47 Cal.Rptr.2d 108, 905 P.2d 1248]; *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 257 [5 Cal.Rptr.2d 545, 825 P.2d 438].) Both prongs of this test are amply met here.

 "[A] particular danger of injustice arises when collateral estoppel is invoked by a nonparty to the prior litigation." (*Vandenberg v. Superior Court, supra,* 21 Cal.4th at p. 829.) Accordingly, "[s]uch cases require close examination to determine whether nonmutual use of the doctrine is fair and appropriate." (*Id.* at p. 830.) In considering whether collateral estoppel is fair and consistent with public policy, particular consideration should be given to whether there was an opportunity for appellate review of adverse rulings. (*Id.* at p. 829.)

The parties to the Madera County criminal proceedings—the People and Union Pacific—agreed that issues of federal preemption would be best resolved in this civil litigation. Therefore, they stipulated to dismissal of the criminal proceedings and abandonment of the People's appeal pending in the Appellate Department of the Madera County Superior Court and agreed the criminal proceedings would not be a procedural bar to full resolution of the issues in this civil action. Chemical Lime was not a party to the criminal proceedings. In now urging that the trial court's decision is conclusive by virtue of dismissal of the appeal, Chemical Lime ignores the stipulation by which the parties to that proceeding agreed to forgo appellate review of the issue. In other words, Chemical Lime, a stranger to the Madera County proceedings, seeks to assert the aspects of the proceeding that Chemical Lime finds favorable, while rejecting the aspects of the proceedings that it finds unfavorable. The injustice of such a position is manifest.

The power to protect the health and welfare of the public, and to provide remedies for injury, is among the most traditional and important powers of the states. (*Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 756 [85 L.Ed.2d 728, 751, 105 S.Ct. 2380].) According to defendants, this important state power is preempted with respect to the transportation of calcium oxide not because the federal government has undertaken to regulate

the transportation of calcium oxide, but because it has not. Taken to its logical conclusion, this argument would mean that anyone transporting or causing the transportation of any material in commerce would have complete immunity from all state regulation or remedies for injury so long as the material is not regulated under HMTA. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 487 [135 L.Ed.2d 700, 716–717, 116 S.Ct. 2240]; see also *id.* at p. 505 [135 L.Ed.2d at p. 728] (conc. opn. of Breyer, J.).) This is a matter of tremendous public significance, and the public interest demands that collateral estoppel be rejected in these circumstances.

## II

In enacting HMTA, Congress stated that "[t]he purpose of this chapter is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce." (49 U.S.C. § 5101, as amended by Pub.L. No. 109-59 (Aug. 10, 2005) 119 Stat. 1891.) Thus, when transportation of certain material in commerce may pose an unreasonable risk to health and safety or property, the Secretary of Transportation (the Secretary) is given the authority to designate that material as hazardous. (49 U.S.C. § 5103(a).) The Secretary is also directed to prescribe regulations governing the safety aspects of the transportation of hazardous materials. (49 U.S.C. § 5103(b)(1)(B).) The regulations apply to persons transporting hazardous material in commerce or causing hazardous material to be transported in commerce. (49 U.S.C. § 5103(b)(1)(A)(i), (ii).)

HMTA was enacted to provide for the development of a uniform national scheme for regulation of the transportation of hazardous substances. (*Com. of Mass. v. U.S. Dept. of Transp.* (D.C. Cir. 1996) 320 U.S. App. D.C. 227 [93 F.3d 890, 891]; *Chlorine Institute v. California Highway Patrol* (9th Cir. 1994) 29 F.3d 495, 496.) The need for such a uniform scheme cannot be doubted. If every state or local government were permitted to enact its own regulations, then some jurisdictions might seek to protect themselves by imposing unreasonable risks on other jurisdictions; as a result, shippers and carriers would be confronted with multiple and at times conflicting regulations. (*Chlorine Institute v. California Highway Patrol, supra,* 29 F.3d at p. 497.)

HMTA includes an express preemption provision (49 U.S.C. § 5125), which states in pertinent part:

"(a) General.—Except as provided in subsections (b), (c), and (e) of this section and unless authorized by another law of the United States, a requirement of a State, political subdivision of a State, or Indian tribe is preempted if—

"(1) complying with a requirement of the State, political subdivision, or tribe and a requirement of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security is not possible; or

"(2) the requirement of the State, political subdivision, or tribe, as applied or enforced, is an obstacle to accomplishing and carrying out this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security.

"(b) Substantive differences.—(1) Except as provided in subsection (c) of this section and unless authorized by another law of the United States, a law, regulation, order, or other requirement of a State, political subdivision of a State, or Indian tribe about any of the following subjects, that is not substantively the same as a provision of this chapter, a regulation prescribed under this chapter, or a hazardous materials transportation security regulation or directive issued by the Secretary of Homeland Security, is preempted:

"(A) the designation, description, and classification of hazardous material.

"(B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.

"(C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of these documents.

"(D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material.

"(E) the design, manufacturing, fabricating, marking, maintenance, reconditioning, repairing, or testing of a packaging or a container represented, marked, certified, or sold as qualified for use in transporting hazardous material."

Defendants contend that HMTA preempts state law with respect to the transportation of calcium oxide. Before discussing the issues, we first must note the breadth of the contention presented.

Unlike the Madera County criminal action in which Union Pacific made a narrow and focused claim of federal preemption, defendants in this civil action argue that state laws and remedies are preempted in their entirety. Thus, they assert (1) preemption of statutes of general application that are not

directed to the transportation of materials but that apply across the board to everyone; (2) preemption of laws not dependent for their application upon an administrative determination that a material is "hazardous," and (3) preemption of remedial laws, such as those imposing an obligation of cleaning up spilled materials and of bearing responsibility for the costs of emergency response, and the assessment and remediation of damage to natural resources.

Moreover, defendants assert preemption not because the federal government regulates the transportation of calcium oxide by rail, but because it does not do so. While in this case we deal with a material that is known to be potentially dangerous if spilled into the environment, and which the Department of Toxic Substances Control has determined meets the EPA criteria of a hazardous waste, the preemption argument would logically extend to any material transported in commerce that is not designated and regulated under HMTA. And, in defendants' view, it would not matter if the material was spilled or deposited inadvertently, negligently, or even intentionally. Thus, consistent with defendants' argument, commercial transporters could contract with dairy farmers to dispose of excess manure by dumping it in our environment and the state would be powerless to prevent or provide a remedy for such conduct.

In considering defendants' broad claim of preemption, we will first review decisional authorities that illustrate how preemption claims are to be resolved. Then we will apply those principles to this case.

*Decisional Authorities*

The exercise of the police power to protect the health and welfare of the public and the environment is primarily and historically a matter of local concern upon which the states traditionally have had great latitude. (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at p. 475 [135 L.Ed.2d at p. 709]; *Huron Portland Cement Co. v. Detroit* (1960) 362 U.S. 440, 442 [4 L.Ed.2d 852, 855, 80 S.Ct. 813].) Thus, courts must be reluctant to find federal preemption of such state laws; indeed, we must presume that the police power of the state is not preempted by federal law, absent " 'a clear and manifest purpose of Congress' " to do so. (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at p. 485 [135 L.Ed.2d at p. 715]; *CSX Transp. v. Easterwood* (1993) 507 U.S. 658, 664 [123 L.Ed.2d 387, 396, 113 S.Ct. 1732]; *Wisconsin Public Intervenor v. Mortier* (1991) 501 U.S. 597, 605 [115 L.Ed.2d 532, 543, 111 S.Ct. 2476].) It follows that there is no presumption against federal preemption when a state tries to directly regulate a matter traditionally within the power of Congress, rather than the state, and upon which Congress has acted. (*United States v. Locke* (2000) 529 U.S. 89, 108–109 [146 L.Ed.2d 69, 88–89, 120 S.Ct. 1135].)

 Although the regulation of interstate commerce is a matter tradition-ally within the power of Congress, the presumption against preemption is fully applicable where, as here, it is claimed that state health, welfare, and safety laws are preempted merely because they may have an indirect effect on commerce. As explained by the Supreme Court, "the Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution.' [Citations.]" (*Huron Portland Cement Co. v. Detroit, supra,* 362 U.S. at pp. 443–444 [4 L.Ed.2d at p. 856].)

 The presumption against preemption is, of course, rebuttable. The " 'purpose of Congress is the ultimate touchstone' in every pre-emption case. [Citations.]" (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at p. 485 [135 L.Ed.2d at pp. 715–716].) The presumption merely means courts will not presume Congress intended to displace the historic police power of the state, unless that is Congress's clear and manifest purpose. (*Ibid.*)

The following authorities show how the aforesaid principles have been applied to federal and state regulations, requirements, and remedies regarding safety aspects of an industry or activity.

 "[G]eneral state common-law requirements" are not preempted by federal law if "they are not the kinds of requirements that Congress and [the federal agency] feared would impede the ability of federal regulators to implement and enforce specific federal requirements." (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at p. 501 [135 L.Ed.2d at p. 725].) For example, the general duty of a manufacturer to avoid foreseeable dangers in its products, and to inform users and purchasers of the risk involved in using a potentially dangerous product, "are no more a threat to federal requirements than would be a state-law duty to comply with local fire prevention regulations and zoning codes, or to use due care in the training and supervision of a work force. These state requirements therefore escape pre-emption . . . because their generality leaves them outside the category of requirements [imposed by the federal law]." (*Id.* at pp. 501–502 [135 L.Ed.2d at pp. 725–726].)

The City of Detroit's smoke abatement law, which was directed at the elimination of air pollution to protect health and to enhance the cleanliness of the city, was not preempted by federal regulations requiring the inspection of ship boilers and other equipment, which were intended to ensure the seagoing safety of vessels subject to federal inspection. (*Huron Portland Cement Co. v. Detroit, supra,* 362 U.S. 440, 445, 446 [4 L.Ed.2d 852, 857, 858].) Because

there was no overlap between the federal inspection standards and the city's health and welfare requirements (*id.* at p. 446 [4 L.Ed.2d at p. 858]), the possession of a federal license authorizing the ship to operate in navigable waters did "not immunize [it] from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce." (*Id.* at p. 447 [4 L.Ed.2d at p. 858].)

A "state-authorized award of punitive damages arising out of the escape of plutonium from a federally licensed nuclear facility" was not precluded by federal law that "has occupied the entire field" relating to the safety aspects of the generation of electricity in nuclear power plants. (*Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 240–241 [78 L.Ed.2d 443, 447, 104 S.Ct. 615]; *Pacific Gas & Elec. v. Energy Resources Comm'n* (1983) 461 U.S. 190, 212 [75 L.Ed.2d 752, 770, 103 S.Ct. 1713].) Congress's decision to prohibit states from regulating the safety aspects of nuclear development did not evidence any intent to "disallow resort to state-law remedies by those suffering injuries from radiation in a nuclear plant." (*Silkwood v. Kerr-McGee Corp., supra,* 464 U.S. at pp. 250–251 [78 L.Ed.2d at p. 454].) Indeed, because Congress did not enact any federal remedy for such personal injuries, it "is difficult to believe that Congress would, without comment, remove all means of judicial recourse," including punitive damages, which "have long been a part of traditional state tort law." (*Id.* at pp. 251, 255 [78 L.Ed.2d at pp. 454, 457].) Moreover, subsequent congressional action demonstrated that "Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents." (*Id.* at p. 256 [78 L.Ed.2d at p. 457].)

A "state common-law negligence action [brought by a person injured due to a failed pacemaker] against the manufacturer of an allegedly defective medical device" was not precluded by a comprehensive federal law enacted " 'to provide for the safety and effectiveness of medical devices intended for human use.' " (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at pp. 474, 502 [135 L.Ed.2d at pp. 709, 726].) Even though the federal law contained an express preemption provision precluding states from establishing or continuing in effect any requirement different from or in addition to federal requirements, or related to the safety and effectiveness of such a medical device (*id.* at pp. 481–482 [135 L.Ed.2d at p. 713]), this clause did not express an intent "to deprive States of any role in protecting consumers from the dangers inherent in many medical devices." (*Id.* at p. 489 [135 L.Ed.2d at p. 718]; see also *id.* at p. 508 [135 L.Ed.2d at p. 730] (conc. opn. of Breyer, J.); *id.* at p. 513 [135 L.Ed.2d at p. 733] (conc. & dis. opn. of O'Connor, J.).) The law did not contain, or imply, a private federal right of action for injuries from a defective medical device, and it was "implausible" that Congress intended to grant "complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation

in order 'to provide for the safety and effectiveness of medical devices intended for human use' [citation]." (*Id.* at p. 487 [135 L.Ed.2d at pp. 716–717]; see also *id.* at p. 508 [135 L.Ed.2d at p. 730] (conc. opn. of Breyer, J.); *id.* at p. 513 [135 L.Ed.2d at p. 733] (conc. & dis. opn. of O'Connor, J.).)

Certain state-law claims for damages brought by peanut farmers, alleging their crops were damaged by a pesticide marketed with a label stating its use was " 'recommended in all areas where peanuts are grown,' " were not preempted by federal law governing labeling and packaging of pesticides and by the federal government's conditional registration of that pesticide. (*Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 435, 443–444 [161 L.Ed.2d 687, 697–698, 703, 125 S.Ct. 1788].) At issue was the federal law's preemption clause, which precluded states from imposing or continuing in effect " 'any requirements for labeling or packaging in addition to or different from those required [by the federal law].' " (*Id.* at p. 443 [161 L.Ed.2d at p. 702].) Although a state-law action against the pesticide manufacturer for defective design, negligent testing, and breach of express warranty might " 'induce' " the manufacturer to change its label, it did not fall within the preemption clause because it did not qualify as a "requirement" within the meaning of the clause. (*Id.* at p. 443 [161 L.Ed.2d at pp. 702–703].) "A requirement is a rule of law that must be obeyed; an event, such as a jury verdict, that merely motivates an optional decision is not a requirement." (*Id.* at p. 445 [161 L.Ed.2d at p. 704].) On the other hand, the preemption clause might prevent some common law claims—such as the farmers' claims of fraud and negligent failure to warn based upon the product label—premised on common law rules that set a standard for product labeling, i.e., "qualify as 'requirements for labeling or packaging.' " (*Id.* at p. 446 [161 L.Ed.2d at pp. 704–705].) However, preemption would not apply if the common law standards for fraud and failure to warn were substantially equivalent to the federal regulatory standards for labeling. (*Id.* at p. 452 [161 L.Ed.2d at p. 709].)

State laws relating to the inspection and regulation of sailing vessels of a certain size and type were not preempted by an elaborate set of federal acts and regulations that governed vessels on the navigable waters of the country but did not explicitly cover those of a size and type regulated by the state. (*Kelly v. Washington* (1937) 302 U.S. 1, 4–8 [82 L.Ed. 3, 7–10, 58 S.Ct. 87].) The Supreme Court rejected the claim that the absence of federal regulation of those specific ships impliedly precluded state regulation of them. "When the State is seeking to prevent the operation of unsafe and unseaworthy vessels in going to and from its ports, it is exercising a protective power akin to that which enables the State to exclude diseased persons, animals and plants. These are not proper subjects of commerce, and an unsafe and unseaworthy vessel is not a proper instrumentality of commerce. When the State is seeking to protect a vital interest, we have always been slow to find that the inaction of Congress has shorn the State of the power which it would

otherwise possess. And we are unable to conclude that . . . the federal laws and regulations, which as we have found are not expressly applicable, carry any implied prohibition of state action." (*Id.* at p. 14 [82 L.Ed. at p. 13].)

Similarly, lawsuits under state common law, alleging negligent design defects in motor vehicle equipment manufactured by the defendant, were not "pre-empted by a federal safety standard [based upon the National Traffic and Motor Vehicle Safety Act of 1966, and regulations thereunder], even though the standard was suspended by a federal court" as a result of the agency's failure to compile sufficient evidence to justify the standard. (*Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, 282, 284–285 [131 L.Ed.2d 385, 389, 390–391, 115 S.Ct. 1483].) Concluding that the act's preemption clause applied only to safety standards that were " 'in effect,' " the Supreme Court held "that the absence of a federal standard cannot implicitly extinguish state common law." (*Id.* at pp. 282, 286 [131 L.Ed.2d 389, 391].)

The same principle was applied by a federal district court in rejecting a claim of preemption under HMTA. (*Waering v. BASF Corp.* (M.D.Pa. 2001) 146 F.Supp.2d 675.) The plaintiff was injured through contact with potassium metabisulfite being transported in commerce by the defendants. The substance was not regulated under HMTA. Nevertheless, the defendants "argue[d] that common law claims springing from improper packing, handling or labeling of potassium metabisulfite would place requirements on regulated parties different from those imposed under the HMTA. Therefore, the argument goes, such common law claims are preempted by § 5125" of the HMTA. (146 F.Supp.2d at p. 680.) The court held that the absence of regulation did not equate with an affirmative decision that transporters of potassium metabisulfite should be free of all regulations and remedies for injury. (*Id.* at pp. 681–682.)

Of course, it is not invariably true that the absence of federal regulation permits states to act. The absence may reflect an affirmative decision, upon weighing and balancing the various considerations, that no regulation is appropriate. (*Freightliner Corp. v. Myrick, supra,* 514 U.S. at pp. 286–287 [131 L.Ed.2d at p. 392]; *Ray v. Atlantic Richfield Co.* (1978) 435 U.S. 151, 178 [55 L.Ed.2d 179, 201, 98 S.Ct. 988].) When Congress intends that an activity not be subject to any regulation or remedies, such that the activity becomes privileged under federal law, then state regulation and remedies are precluded. (*Machinists v. Wisconsin Emp. Rel. Comm'n* (1976) 427 U.S. 132, 141 [49 L.Ed.2d 396, 404, 96 S.Ct. 2548].) However, that intent must be " 'clear and manifest.' " (*Medtronic, Inc. v. Lohr, supra,* 518 U.S. at p. 485 [135 L.Ed.2d at p. 715].)

Even when the federal law contains a preemption clause, it may permit states to act if they are authorized to do so by another federal law. For

example, the preemption clause of HMTA provides for preemption "unless authorized by another law of the United States." (49 U.S.C. § 5125(a) & (b).) Similar language is used in the Toxic Substances Control Act. (15 U.S.C. § 2601 et seq.) Under that act, a state requirement would be preempted unless it was adopted under the Clean Air Act or any other federal law. (15 U.S.C. § 2617(a)(2)(B)(ii).) Thus, state regulation of the storage of polychlorinated biphenyls, a hazardous substance, was not preempted by the Toxic Substances Control Act because the state law was enacted pursuant to the authority granted to the state by the federal Resource Conservation and Recovery Act of 1976. (*People v. Todd Shipyards Corp.* (1987) 192 Cal.App.3d Supp. 20, 37–38 [238 Cal.Rptr. 761].)

*Application of legal principles to this case*

1. *Verbal Notification*

The complaint charges Union Pacific with the failure to provide immediate verbal notification of the spill, as required by Health and Safety Code section 25507 and Public Utilities Code section 7672.5. As we will explain, this verbal notification requirement is not preempted by HMTA.

State and federal law recognize that immediate emergency response to the spill of hazardous materials is essential to avoiding or minimizing injury. (Health & Saf. Code, § 25500 et seq.; 42 U.S.C. § 11001 et seq. [the Emergency Planning and Community Right-to-Know Act of 1986].) In this light, an immediate verbal report of a spill of a potentially dangerous material is just common sense and common decency.

The federal Department of Transportation recognized this in DOT Inconsistency Ruling (IR-3) (Boston) 46 Fed.Reg. 18918 (Mar. 26, 1981). There, under an earlier version of HMTA, the Department concluded that while state requirements for submission of subsequent *written* reports are preempted, a state requirement of an immediate *verbal* notification is not. (See also DOT Inconsistency Ruling (IR-28) (San Jose) 55 Fed.Reg. 8884 (Mar. 8, 1990); DOT Inconsistency Ruling (IR-2) (Rhode Island) 44 Fed.Reg. 75566 (Dec. 20, 1979).) The federal district court reached the same conclusion in *National Tank Truck Carriers, Inc. v. Burke* (D.R.I. 1982) 535 F.Supp. 509, stating: "It goes almost without saying, that such notice should be given with or without a regulation which requires it. It is neither inconsistent nor in conflict with nor contrary to the purpose of Congressional policy." (*Id.* at p. 519.) The court of appeals affirmed this decision for the reasons stated by the trial court. (*National Tank Truck Carriers, Inc. v. Burke* (1st Cir. 1983) 698 F.2d 559.)

When Congress enacted the preemption provision of HMTA in its current form, it provided for preemption of state requirements regarding written

notification, recording, and reporting of spills. (49 U.S.C. § 5125(b)(1)(D).) Although the House Report explained that consistency in written reports was necessary, it stated: "The oral notification and reporting of unintentional releases has been specifically excluded from this paragraph in order to permit State and local jurisdictions to develop the full range of possible alternatives in emergency response capabilities (such as requiring carriers to telephone local emergency responders)." (H.R.Rep. No. 101-444, 2d. Sess., pt. 1, pp. 33–34 (1990).)

Congress has expressly recognized the importance of immediate notification of the spilling of a dangerous substance. In the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C. § 9601 et seq.), Congress imposed a verbal notification requirement upon persons in charge of a vessel or an offshore or onshore facility when they have knowledge of a release of hazardous substances. (42 U.S.C. § 9603(a).) Under CERCLA, "facility" includes motor vehicles, rolling stock, and airplanes. (42 U.S.C. § 9601(9).) "Hazardous substance" under CERCLA includes substances identified under a number of other federal acts. (42 U.S.C. § 9601(14).) With respect to RCRA, the CERCLA hazardous substances include "any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C. § 6921] . . . ." (42 U.S.C. § 9601(14).) Thus, CERCLA applies to substances that meet the criteria established by the EPA under RCRA, as well as substances that are specifically listed. As we already have noted, the Department of Toxic Substances Control has determined that calcium oxide meets the EPA criteria under RCRA.

We also note that the Emergency Planning and Community Right-to-Know Act imposes a notification requirement upon the release of a substance that requires notification under CERCLA. (42 U.S.C. § 11004(a)(3).) While transporters of substances are otherwise exempt from the Emergency Planning and Community Right-to-Know Act, they are expressly made subject to the notification requirements of the act. (42 U.S.C. §§ 11004(b) & (d), 11047.)

In sum, (1) the federal Department of Transportation has concluded that state verbal notification requirements are not preempted by HMTA; (2) the federal court of appeals has concluded that state verbal reporting requirements are not preempted by HMTA; (3) in enacting the preemption provision of HMTA, Congress intended to exempt state verbal reporting requirements from preemption in order to allow state and local jurisdictions to develop emergency response capabilities; (4) our state's Health and Safety Code provisions were adopted pursuant to the express authority of the federal RCRA, which is authority conferred "by another law of the United States" (49 U.S.C. § 5125(a) & (b) of HMTA); (5) pursuant to the authority granted

under RCRA, the Department of Toxic Substances Control has concluded that calcium oxide meets the RCRA criteria of a hazardous waste; and (6) with respect to substances that meet the RCRA criteria of a hazardous waste, CERCLA and the Emergency Planning and Community Right-to-Know Act impose verbal reporting requirements upon transporters.

■ For these reasons, we conclude California's verbal reporting requirements are not preempted by HMTA; rather, they are consistent with, and authorized by, federal law.

### 2. *Remedial Claims*

■ Some of the claims in the complaint are remedial in character. For example, the complaint asserts that defendants must (1) abate or pay for abatement of the nuisance, (2) clean up or pay for cleanup of the spill, and (3) bear the costs of assessment and remediation of damage to our natural resources. The duties upon which these claims are predicated are not directed to transporters in particular, but are general duties imposed upon everyone. They do not seek to impose specific requirements upon an enterprise or activity, but are intended to provide a remedy for injuries that result from an enterprise or activity. Although railroad safety is extensively regulated by the federal government, railroads are not generally immune from state remedies for injuries they cause through their operations. (See 65 Am.Jur.2d (2001) Railroads, §§ 278–474, pp. 372–525; 53 Cal.Jur.3d (2004) Railroads, §§ 59–104, pp. 611–673.)

In HMTA, Congress gave the Secretary the authority to regulate the safety aspects of the transportation of hazardous material. (49 U.S.C. § 5103(b)(1)(B).) Congress intended to preempt inconsistent state regulation of the safety aspects of the transportation of hazardous material. (49 U.S.C. § 5125(a) & (b).)

■ Absent clear and manifest statutory language to the contrary, federal preemption of the regulation of the safety aspects of an industry or activity does not preempt state remedies for injury. (*Bates v. Dow Agrosciences LLC, supra,* 544 U.S. at pp. 443–444 [161 L.Ed.2d at p. 703]; *Silkwood v. Kerr-McGee Corp., supra,* 464 U.S. at p. 251 [78 L.Ed.2d at p. 454].)

■ We find nothing in HMTA clearly and manifestly establishing a congressional intent that transporters of material in commerce are to be wholly immune from state remedies for consequential injuries resulting from their activities.

■ This is particularly true in view of the fact defendants claim immunity from state remedies, not because the federal government regulates

the transport of calcium oxide by rail, but because it does not. Generally, the absence of federal regulation does not implicitly extinguish remedial state laws. (*Freightliner Corp. v. Myrick, supra,* 514 U.S. at pp. 282, 286 [131 L.Ed.2d at pp. 389, 392]; *Kelly v. Washington, supra,* 302 U.S. at p. 14 [82 L.Ed. at p. 13].) States may act unless it appears that the absence of federal regulation reflects an affirmative decision, upon weighing and balancing the various considerations, that no regulation or remedies are appropriate. (*Freightliner Corp. v. Myrick, supra,* 514 U.S. at pp. 286–287 [131 L.Ed.2d at p. 392]; *Ray v. Atlantic Richfield Co., supra,* 435 U.S. at p. 178 [55 L.Ed.2d at p. 201].)

The federal Department of Transportation determined that the transportation of calcium oxide should be regulated under HMTA with respect to air transportation only. This represents a determination that it is unnecessary under HMTA to regulate the transportation of calcium oxide by rail or motor carrier. We do not perceive this to be an affirmative decision that transporters of calcium oxide must be totally immune from state remedies for consequential injuries caused during the transportation of calcium oxide. In this respect, we agree with the federal court in *Waering v. BASF Corp., supra,* 146 F.Supp.2d at pages 681 and 682, that the absence of regulation of a material under HMTA does not equate with an affirmative decision that transporters of such materials must be free of all remedies for injury. The remedial claims the People assert are not directed to regulation of the safety aspects of the transportation of calcium oxide; they are directed to providing remedies for consequential injuries caused by spilling calcium oxide into the environment. They are not preempted by the HMTA.

Moreover, the claims that defendants must bear the costs of cleaning up the spill and for the assessment and remediation of damage to natural resources are predicated on Health and Safety Code section 25189.1. That section is part of our state program for hazardous waste control which was adopted in lieu of federal regulation under RCRA. (Health & Saf. Code, § 25101, subd. (d).) It was adopted under the express authority granted to our state in RCRA. (42 U.S.C. § 6926.) RCRA is a law of the United States that authorizes the enactment of the Health and Safety Code provisions the People seek to apply here. Those provisions are thus beyond the preemption provisions of HMTA. (49 U.S.C. § 5125(a) & (b); *People v. Todd Shipyards Corp., supra,* 192 Cal.App.3d at pp. Supp. 37–38.)

■ Defendants claim immunity from our hazardous waste laws because they are transporters. Transporters of hazardous waste are not immune from regulation under RCRA. RCRA provides that nothing in the act shall be construed to apply to, or authorize any state, interstate, or local authority to regulate, any activity or substance that is subject to certain other federal acts. (42 U.S.C. § 6905(a).) HMTA is conspicuously absent from the list of other federal acts. (*Ibid.*)

■ Under RCRA, the administrator of the EPA is directed to promulgate regulations establishing standards applicable to transporters of RCRA hazardous waste such as are necessary to protect human health and the environment. (42 U.S.C. § 6923(a).) With respect to materials subject to HMTA, the EPA regulations must be consistent with the requirements of HMTA and regulations thereunder. (42 U.S.C. § 6923(b).) The clear import of this provision is that HMTA preempts regulation of the transportation of a hazardous material to the extent it regulates the transportation of a material, but that the transportation of RCRA hazardous wastes that are not regulated under HMTA is subject to regulation under RCRA.

RCRA and our state program in lieu of federal regulation include provisions applicable to transporters of hazardous waste. (42 U.S.C. § 6923; Health & Saf. Code, §§ 25160–25169.3.) Those provisions are not implicated here because, as we shall explain, calcium oxide does not become a waste under the law until it is discharged into the environment. But the transportation provisions of RCRA demonstrate congressional intent that transporters are not immune from regulation under RCRA and state programs authorized by that act.

■ Finally, we note that CERCLA expressly recognizes the authority of a state to impose liability with respect to release of hazardous substances within the state, including removal costs or damages or claims, although the same removal costs or damages or claims cannot be recovered under both state and federal law. (42 U.S.C. §§ 9614(a) & (b), 9658.) CERCLA imposes liability upon persons, including transporters, for damages and remedial measures required due to the release of hazardous substances. (42 U.S.C. § 9607(a).)

■ Hazardous substances under CERCLA are those substances that are designated or listed under a number of other federal acts, including substances having the characteristics identified under or listed pursuant to RCRA. (42 U.S.C. § 9601(14).) In addition, the administrator of the EPA is authorized to designate additional substances as hazardous under CERCLA. (42 U.S.C. §§ 9601(14)(B), 9602.) CERCLA states that when a substance is listed or designated under CERCLA, then it shall be listed and regulated under HMTA. (42 U.S.C. § 9656(a).)

CERCLA further provides that a "common or contract carrier shall be liable under other law in lieu of section 9607 of this title for damages or remedial action resulting from the release of a hazardous substance during the course of transportation which commenced prior to the effective date of the listing and regulation of such substance as a hazardous material under [HMTA], or for substances listed pursuant to subsection (a) of this section,

prior to the effective date of such listing: *Provided, however,* That this subsection shall not apply where such a carrier can demonstrate that he did not have actual knowledge of the identity or nature of the substance released." (42 U.S.C. § 9656(b).) Other law, of course, includes state law. (42 U.S.C. § 9614(a).)

 This latter provision plainly reflects congressional intent and understanding that, subject to the defense of a lack of knowledge, transporters are liable under state law for damages and remedial action resulting from the release of substances that are not regulated under HMTA.[5] We may consider these provisions of CERCLA in considering congressional intent with respect to preemption of state remedies by HMTA. (*Silkwood v. Kerr-McGee Corp., supra,* 464 U.S. at pp. 251–252 [78 L.Ed.2d at pp. 454–455].)

Defendants appear to concede that in appropriate circumstances at least some remedial measures may be imposed upon them. However, they argue the People's complaint "does not allege that a State environmental agency has performed any cleanup, issued any order, or even made any finding of actual pollution."

The complaint asserts claims for remedial measures, such as abatement, cleanup, liability for the costs of assessment of injury to natural resources, and damages. The trial court sustained a demurrer, without leave to amend, to the initial complaint based upon the court's erroneous conclusion that state law and remedies are preempted in their entirety by federal law. The court did not sustain the demurrer due to insufficient pleading. Ordinarily, it would be a manifest abuse of discretion to sustain a demurrer without leave to amend an initial complaint where the pleading defect could be cured by amendment. (See 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 943–944, pp. 400–403.) Assuming that the complaint does not sufficiently plead injury, this is a curable defect and we cannot presume that the People are unable to plead some measure of injury in support of their claims.

For the aforesaid reasons, we conclude the remedial claims asserted by the People are not preempted by HMTA.

### 3. *Civil Penalties*

 Civil penalties are imposed "as a means of securing obedience" to statutes and regulations validly adopted under the police power. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 398 [149 Cal.Rptr. 375, 584 P.2d 512].) They

---

[5] An alternative construction, that transporters become retroactively liable under state law for prior releases once a substance is regulated under HMTA, but are immune from liability until that time, is absurd. We will not ascribe such an intent to Congress.

are punitive in character. (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731, 739 [108 Cal.Rptr. 845, 511 P.2d 1197]; *County of San Diego v. Milotz* (1956) 46 Cal.2d 761, 766 [300 P.2d 1].) Civil penalties may be imposed without regard to actual damage that may have been sustained. (*Garrett v. Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d at p. 739.) Indeed, a "characteristic feature of a penalty is its lack of proportional relation to [actual] damages . . . ." (*Ibid.*)

Some of the claims the People assert are for the imposition of civil penalties. For example, Fish and Game Code section 5650.1, Health and Safety Code sections 25189, subdivision (d), 25189.2, subdivision (b), 25514, and Public Utilities Code section 7724.5 impose civil penalties.

■ For purposes of federal preemption, the imposition of civil penalties is substantively different than the provision of remedies for consequential damage caused by an activity. (*Southern R. Co. v. Reid* (1911) 222 U.S. 424, 443 [56 L.Ed. 257, 262, 32 S.Ct. 140].)

We conclude that, with one exception, the civil penalties sought by the People are preempted by HMTA.

■ Civil penalties are inherently regulatory, not remedial. (See *Hale v. Morgan, supra,* 22 Cal.3d at p. 398; *Garrett v. Coast & Southern Fed. Sav. & Loan Assn., supra,* 9 Cal.3d at p. 739.) Thus, to impose a civil penalty upon an incident or event, without regard to whether injury was suffered, is to regulate the activity that gave rise to the incident or event. (*Southern R. Co. v. Reid, supra,* 222 U.S. at pp. 441–443 [56 L.Ed. at p. 262].)

Here, the People assert that civil penalties became payable immediately when, and due to the mere fact that, calcium oxide was spilled. We agree with the People that there is a distinction between "laws about the transportation of hazardous substances, [and] laws that govern what happens after a material has been spilled from a train." However, with one exception, the civil penalties sought by the People are not addressed to what defendants did or did not do after the spill; rather, they seek the imposition of penalties for the mere fact of the spill itself. A civil penalty imposed for the fact of the spill does not govern what happens after the spill; it regulates the activity that gave rise to the spill. In this case, it constitutes regulation of the transportation of calcium oxide.

The federal Department of Transportation decided to regulate the transportation of calcium oxide by air only, which represented a conclusion that it was unnecessary to regulate the transportation of calcium oxide by rail. To the extent that the People's claims for civil penalties depend upon a designation of calcium oxide as a hazardous material, the claims are inconsistent with regulations under HMTA. (49 U.S.C. § 5125(b)(1)(A).)

Moreover, the People's claims are based upon the manner in which defendants packed, repacked, or handled calcium oxide, or upon the design, manufacturing, fabricating, maintenance, reconditioning, repairing, or testing of the container in which it was transported. These claims are inconsistent with regulations under HMTA. (49 U.S.C. § 5125(b)(1)(B) & (E).)

In concluding that remedial claims are not preempted by HMTA, we rely in part upon the authority granted to the state in RCRA. The result is different as to the civil penalties the People seek to impose.

RCRA authorized the state to adopt a "hazardous waste program." (42 U.S.C. § 6926(b).) In order to be a hazardous waste, a material must be a waste. (42 U.S.C. § 6903(5); Health & Saf. Code, §§ 25117, 25124.) Calcium oxide has many beneficial uses. It was transported not for disposal as a waste, but for sale as a commodity. The calcium oxide in this case did not become a waste until it was "disposed of" by spilling or leaking. (Health & Saf. Code, §§ 25113, subd. (a)(1), 25124, subd. (b)(1)(A).) The imposition of civil penalties, without regard to injury, upon the very event by which the calcium oxide became a waste would not regulate hazardous waste; however, it would be regulation of the activity through which the calcium oxide became a waste, i.e., the transportation of a commodity. RCRA does not confer upon the state the authority to regulate the transportation of a commodity in disregard of HMTA simply because the commodity may become a hazardous waste in some circumstances.

Thus, we conclude the People's claims for civil penalties simply because calcium oxide was spilled, and without regard to consequential injuries, are preempted by HMTA.

We also conclude the People's claim for a civil penalty based upon an alleged failure to train employees with regard to a release or threatened release of calcium oxide (Health & Saf. Code, § 25504) is preempted by HMTA. The potential of remedial liability arising from the spill of calcium oxide may induce the defendants to train employees with regard to responding to such a spill, but is not a preempted state requirement. (*Bates v. Dow Agrosciences LLC, supra*, 544 U.S. at p. 445 [161 L.Ed.2d at p. 704].) However, the imposition of civil penalties without regard to injury based upon an alleged failure to train employees is a preempted state requirement. (*Bates v. Dow Agrosciences LLC, supra*, 544 U.S. at p. 445 [161 L.Ed.2d at p. 704].)

The one exception to our conclusion is the claim for civil penalties for the failure to provide immediate verbal notification of the spill. We have previously concluded the requirement of verbal notification is not preempted by HMTA. The requirement is triggered by the release of hazardous material into the environment and thus arises when the material becomes a hazardous waste subject to state regulation under RCRA. The requirement does not regulate the transportation of hazardous material; it is a general duty imposed upon everyone in aid of our emergency response capabilities. Accordingly, civil penalties in support of that requirement are not preempted by HMTA.

III

Having rejected preemption claims under the more stringent preemption provisions of HMTA, we conclude that the less stringent preemption provisions of FRSA do not support a contrary result.

 FRSA was enacted to promote safety in railroad operations and to reduce railroad-related accidents and incidents. (49 U.S.C. § 20101.) It provides that laws, regulations, and orders relating to railroad safety shall be uniform nationally, to the extent practicable. (49 U.S.C. § 20106.) However, a state may regulate aspects of railroad safety if the Secretary of Transportation has not prescribed a regulation or issued an order covering the subject matter. (*Ibid.*) A state also may impose additional or more stringent requirements where necessary to eliminate or reduce an essentially local safety hazard, provided the state requirement is not incompatible with federal law and does not unreasonably burden interstate commerce. (*Ibid.*)

 FRSA does not generally preempt state remedies. (*CSX Transp. v. Easterwood, supra,* 507 U.S. at pp. 667–668 [123 L.Ed.2d at p. 399].) However, if a federal regulation covers a particular matter and the railroad was operating within the requirements of the regulation, then a state claim based solely upon the covered subject will be precluded. (*Id.* at pp. 675–676 [123 L.Ed.2d at pp. 403–404].) For example, where federal regulation established a speed limit and a train was moving below that limit, then a tort claim based solely upon a claim of excessive speed would be precluded. (*Ibid.*)

To the extent we have concluded the People's claims for civil penalties are preempted by HMTA, we need not consider whether they are also preempted by FRSA. As for the claims not preempted by HMTA—the failure to make immediate verbal notification, and the remedial claims for the consequences of discharging calcium oxide into the environment—we conclude they are not preempted by FRSA.

FRSA addresses a number of particular safety aspects of railroad activity (49 U.S.C. §§ 20131–20153), but it does not speak to the transportation of dangerous materials or to the discharge of such materials into the environment. Nevertheless, according to defendants, "FRSA preemption applies so long as the Secretary of Transportation has adopted a regulation related to railroad safety, regardless of the legislation that authorized the regulation. . . . Consequently, a regulation issued under the HMTA will support preemption in the same manner as a regulation issued pursuant to the FRSA."

██ However, the transportation of calcium oxide by rail is not regulated under HMTA, and the preemption provision of FRSA does not preclude state law where there is no federal regulation covering the subject matter. (49 U.S.C. § 20106.)

## CONCLUSION

We have determined that the state requirement of an immediate verbal notice of the discharge of a hazardous material, and the civil penalty that attaches to such a violation, are not preempted by federal law. We also have determined that remedial claims, such as abatement, cleanup, assessment and remediation of injury to natural resources, and consequential damages, are not preempted by federal law. However, the People's claims for civil penalties for the alleged failure to train employees and for the fact of the calcium oxide spill itself are preempted by HMTA.

██ We have addressed the issues in the manner in which they were presented and resolved by the trial court, i.e., as a claim that state laws and remedies are on their face, and in their entirety, preempted by federal law. A state law not facially preempted may be shown to be fatally inconsistent with federal law by the development of a factual record through the presentation of evidence. (*Florida Avocado Growers v. Paul* (1963) 373 U.S. 132, 156 [10 L.Ed.2d 248, 264–265, 83 S.Ct. 1210]; *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 943–944 [216 Cal.Rptr. 345, 702 P.2d 503].) But this cannot be resolved upon demurrer; it requires the process of a trial. Thus, we express no opinion on that issue.

We also express no opinion on whether the People have pleaded their claims sufficiently. The trial court sustained the demurrer without leave to amend based solely upon its view of federal preemption. That is the only issue we have considered on appeal.

## DISPOSITION

The judgment is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion. Union Pacific and Chemical Lime shall reimburse the People for costs on appeal. (Cal. Rules of Court, rule 27(a).)

Morrison, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied August 31, 2006, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied November 15, 2006, S146498.